With that, I will call the first case, Rappaport v. Nivoda USA. May it please the Court. Jordan Greenberger for Appellant Rappaport USA. The District Court should be reversed because there was error to dismiss the complaint at the pleading stage on the basis of the merger doctrine. Rappaport's complaint alleged that its price list is an expression of Rappaport's original opinion and the price list itself, which was before the Court on the motion, also says on its face that it is an expression of Rappaport's opinion. So is it your position that every individual price number is an independent, copyrightable opinion? The entirety of the price list is, and those numbers are as well because they are a collection of Rappaport's thought and analysis that has made its way onto the page. The issue that the District Court kind of identified during oral argument was, well, what if just one of those numbers is copied? That's not what's alleged here. We're alleging that Nivoda has copied the entirety of the price list. But if it was just one number that was being copied, that would be more along the lines of the de minimis rule for copyright infringement, where the Court doesn't bother itself with triflings. But here, the allegation is that the entirety of the price list is being exploited by Nivoda without authorization. So I think you would say that if what their website had said was not this sort of vague comparative market price, but had said, this is different by X amount to what Zales itself is saying this year, you would say that that is not copyrightable because that was a fact. Is that right? That's right, because under your hypothetical, if I understand it correctly, the Zales price, that's the sales price that Zales or whatever jeweler is selling the diamonds for. But Rappaport is not publishing in its price list the price of any real-world diamond. It's not publishing the price of any sales transaction. It's giving its estimate based on its expertise and subjective opinion as to what should be the price of a hypothetical diamond. Indeed, if you look in the deposit copies which Nivoda submitted, which is the Rappaport magazine, which includes editions of the price list, preceding the price list is a guide. It's extremely informative. It tells you that Rappaport is, A, it's its opinion. The market trades at different – Let me just make sure we get to at least the part that would help me the most. Sure. If the list was meant to reflect the market reality, though, you would say that that was not copyrightable. Is that correct? I wouldn't agree with that, no. Okay. So explain that to me then. It's a hypothetical, so the price list does not reflect the actual prices. But even still, if it was meant to reflect the market reality, as its opinion, necessarily it's not a fact, right? And so facts, we agree. It's undisputed. Under copyright law – Well, if that's true, then can you explain to me how that's different than New York Mercantile then? Absolutely. So New York Mercantile, in the first place, was at a totally different procedural posture, which was at summary judgment, okay? Here this was a Rule 12b6 motion that the Court should have accepted the allegations as true. And the importance of that is that when analyzing the merger doctrine, this Court has said it needs to be determined given considerable care. That's from the Kragos case. And in the Hart case – There's a lot of wind-up in your time. Can you focus?  So you said – what I think you said, which was different than what I thought you were going to say, was that even if the Rappaport list reflects the market reality, you still have a copyrightable number. Is that – did I at least get that part of your – That's right. Because Rappaport doesn't control the market. Rappaport is not a king on high saying, this is what the price should be. Rappaport just says, this is my opinion. Now, if the market happens to fluctuate – now, to your point on New York Mercantile – I'm sorry. So just – I need this building block. If your number was instead the market reality, would that be copyrightable? No, because it would be a fact, right? It would be like a newspaper publishing the closing price of a stock. So your assumption is that it is not the market reality.  It's not. In fact, we say – Okay. So that's why it's not the same as New York Mercantile. Okay. Got it. Right. So New York Mercantile, again, was summary judgment. And also, New York Merc, if you look at footnote 5, is actually very informative in that case because that's the footnote where it distinguishes itself from this Court's decision in CCC. CCC was a Second Circuit decision from 1994 involving pricing opinions for used cars. And the Court said, we're going to withhold application of the merger doctrine because under this Court's precedent, if something is infused with personal taste or opinion, the merger doctrine does not apply, right? And so in CCC, which is the Second Circuit case involving used car prices, as well as in the Ninth Circuit case, CDN, which was the publisher's pricing opinion for collector coins, what you find is courts are saying, that's not what the merger doctrine is about. The merger doctrine and the cases that are cited really have to do with facts. This is the closing price of a commodities future contract in New York Mercantile. In Banksport. Well, in New York Mercantile, they did, I mean, I think it's acknowledged in the opinion that if it closes a trading day, they had to assess some things other than just a price fact. I think they say trade, bids, offers, and in some instances, off-exchange information. But that wasn't enough to avoid application of the merger doctrine. Right. So you're right. In New York Mercantile, the Court says, we're not deciding this on whether it's a fact or a not fact. What the real issue in New York Mercantile was, what was the level, what was the range of numbers that could be determined, right? What was the level of dissension? And the only reason the Court was able to make a determination was because there had been discovery. There had been depositions. There had been everything that goes into the factual evidentiary thing that this Court in heart said is, that's our strong preference. When we're determining what is the range of possible expression, our strong preference is for there to be a developed record. In this case, there is no developed record beyond the complaint and the deposit copies. So what we have said on this appeal is, we strongly believe that this case falls within the CCC and CDM line of cases, okay? But we acknowledge that this is a Rule 12b-6 motion to dismiss, accept our allegations as true, and let's move forward with discovery. If Nevoda wants to — I'm sorry. So you're not now, at this point, asking for a reversal. You're asking for us to vacate and remand for discovery? I thought your position was reversal. Well, a reversal, I believe, would result in remanding the case for Nevoda to answer and for discovery. So — So you don't think at this point we have enough to say the merger doctrine does not apply? I recognize that this is an issue that courts primarily wait until summary judgment to determine. And on a Rule 12b-6 motion, what was before the Court, the allegations are supposed to be accepted as true, that we strongly, strongly believe that the merger doctrine does not apply. But if Nevoda wants to pursue that as a defense to the claim, let's have discovery on the issue. They can put it in answer, and we'll go from there. You know, we didn't even get an opportunity to amend. And if the Court has questions about whether, you know, we say it's our opinion, we say that there's a proprietary method that goes into creating these numbers — I'm sorry. I see my time is up. If I can just finish my thought. Then at least Rappaport should have been given an opportunity to amend, to address those in amended pleading, if the Court does have concerns about that. I mean, just so I understand, what I think, I understand your primary contention here is, all we have to work on is the complaint at this point. And your complaint doesn't really explain how this price list is formed. We believe we have satisfied Rule 8's notice pleading standard, and we said it's  Yeah, no, I mean in terms of having enough information to know whether the merger doctrine applies. We believe — we have pleaded enough to get past a motion to dismiss, because we've said it's our subjective opinion, and all the courts have said, when it's a subjective opinion, the merger doctrine does not apply. But if the Court has questions or believes that more should be put in, at least give us an opportunity to amend. This was — Judge Rakoff dismissed our original complaint without giving us any opportunity to respond to any — I mean, my assumption here is that in a hypothetical future, if you were to prevail in getting the relief that you're asking for, and there's discovery, you could have a world where a year from now, your opponents move again, this time for summary judgment based on merger, because they say all of the evidence turned up during discovery shows that the only thing Rappaport does is take reports of actual sales in the market, average them all, and that's how they make their list, and then they would make the pitch. That is a discoverable fact. There is no range to be had there. It's like the settlement price, that the potential deviation is almost nil. Or you could have a summary judgment record where there is all sorts of evidence from your side saying, well, yeah, we look at market reports, but we're also looking at reports of how mining is happening in South Africa and where we think the mines are going, and we factor in all of these intangible things that require our unique knowledge of the diamond market. And the prices that get put on this sheet are — nobody else could replicate them just by averaging a bunch of data, and in which case, presumably, you would be arguing that Merchant clearly doesn't apply. That seems to be sort of where we're going. I agree. It's possible, if this is remanded and we go forward with discovery, that they will make a motion for summary judgment, and we would oppose it. You know, as I stand here today, I strongly believe that they will not come to that conclusion, but at least let's explore that in discovery. We never even had the opportunity to do that. Okay. I'll be back for rebuttal. Thank you. Thank you. Matthew Leash, for Novota USA. The fundamental question here is whether Rappaport, which by its own pleading sets the international benchmark by which dealers all over the world set diamond prices, can prohibit anybody else from so much as obliquely referring to those prices when discussing prices.    I'm sorry. So is that just to be very clear, are you at this point conceding that the percentages on the website correspond to the Rappaport price list? The percentages on the website reference a difference between the sale price of the diamond and the Rappaport price for diamonds of that quality. It doesn't say that explicitly, but I don't think anybody's disputing that. So it doesn't have an actual price. It has a percentage difference. I just wanted to make sure you were conceding that. Yes. And can I also ask, does your argument depend in distinguishing whether it's CCN, is it CCN or NYSE precedent applied, NYMEX, does it depend on what inputs they use to create this benchmark? So in other words, if it is basically something like a discoverable fact and it's just, you know, there's no way that the numbers could be anything other than these numbers, then you win. But if it turns out that a huge percentage of the inputs go far beyond discoverable market facts and it's also people scratching their heads and talking about the likelihood that, you know, the mines in South Africa are probably going to be disturbed over the next 10 years because of weather conditions and, you know, other things and, you know, they're just making all sorts of idiosyncratic projections about things that are not discernible in the market, then you would lose? Or are you saying that even if there's all sorts of other value add that they put in that nobody else could put in, it still merges because it's a number? We believe we win anyway, Your Honor. So why? Why does the nature of the inputs not matter? It's not that the inputs don't matter. It's that the output is by Rappaport's own pleading, the international benchmark. That is a fact. What if, let me have a hypothetical. Let's say that they created this entirely without looking at current or recent sales of diamonds, but everybody still uses it as a benchmark. I know that's a far-fetched hypothetical, but just bear with me. If they just made it up out of their head. If they did, but everyone said, these guys must have a crystal ball because they always turn out to have the right answer. I think under that hypothetical, it still would be merged because that still would be the benchmark price that everybody uses. You know, the case law talks about not giving somebody a monopoly on facts and not letting somebody corner the market essentially on financial information that everybody uses. And under even that scenario. You're saying it's the third party's reliance, universal reliance on this number that makes it a fact. The fact is the fact that they've said it, not that there are underlying facts that back it up. The fact that they've said it and that it's relied on universally as the benchmark by their own pleading. And there's a quote from the Southern District Decision and Bank Corps, which I don't have the precise language in front of me, but essentially is the more that an opinion is relied on the market, the more fact-like it becomes. So what do we do? And I don't want to interrupt my colleague's line of thinking, but like, what do we do about the fact that they're, that Rappaport has competitors, that there's at least two other people that they've alleged provide a similar product and we don't know how other people use them. And just because they, what do we do with those facts? Yeah. So again, Your Honor, in Bank Corps, the court said it doesn't matter that there are other competitive, and that case was interest rates. It's not binding. It's not binding, but it's persuasive. Absolutely. I think, I think correct. So it doesn't matter that there are other competitors, that there are other valuations, that there are other people who think that they know what market, what Diamond should go for. I don't believe so. Again, partly because they plead themselves that this is, their price list is the international benchmark. They don't say it's a benchmark. Well, that puts a lot of weight on the, on the use of the phrase international benchmark in this context. Can you talk a little bit about how you would, how you distinguish CCC and CDN? Sure. I'm sure that the author of the Red Book also said anybody who's going to buy a used car needs to go here. Well, one difference, Your Honor, is that CCC is really a compilation case. And the court expressly said and reiterated in NIMEX when talking about CCC that the court was not deciding whether an individual price is copyrightable. It was the fact that the defendant there had taken basically the entire compilation and reproduced it and was offering it to its clients. That is not the case here. Mr. Greenberger said that they do allege that the whole price list was taken. That's not really pled. They're complaining that any individual number can't be taken without constituting copyright infringement. And if you look at the Nevada site, the list has not been reproduced. Not even any number has been reproduced, but it's a particular diamond. We'll have a price and we'll say what the discount is, admittedly off of the rapid pour price. But that's very different than CCC. CDN is kind of an outlier. That one did find that individual prices can be copyrightable, but it relied on the compilation cases, which was, we believe, incorrect. And several courts in the circuit have pointed out that that's incorrect. That's sort of an inappropriate extension of the case law on compilations. What do you do, if I may, in the NIMEX case on page 118, what I thought was sort of the money part of our holding in merger is we say it's undisputed that all possible expression of their idea, the settlement numbered idea, takes the same form of number. And it said the question then becomes the possible range of the number. And then we said, well, NIMEX says that there are numerous possible variations. But we said, no, it has not demonstrated a range of possible variations that would preclude application of the merger doctrine. That seems to depend on what I was describing earlier as the inputs, that we were saying, look, these are people who are looking at how the futures were trading that day. And yes, they have a little area where they can tweak things here and there on occasion, but they're basically constrained on what they can put forth. At least in my hypothetical before, I was saying, well, what if the benchmark they're putting forth is based on purely idiosyncratic inputs, not based on just data that anyone else, if they were able to do so, would compile and put out on their own. And you, as I understood, responded that, no, no, it doesn't matter what the inputs are. It matters on how other people are relying on it. But that's not what we said NIMEX. I read this as saying they couldn't have said much different. So, of course, it had to be this number. So, of course, it's merged. So, I'm not understanding how you're, I think, telling us the inputs don't matter. But if that's true, why would we have said that there could not have been a range of possible variations in NIMEX and that was the distinguishing factor for our holding? It's a fair question. And I would not say the inputs don't matter. I'd say both matter, inputs and outputs. But if you look at NIMEX, in that case, even there, this court pointed out that that's where the, I think they call them the low-volume months, there was a real question as to whether NIMEX exercised judgment, whether they considered factors other than the numbers. Well, but we didn't seem to think there was much of a judgment. I mean, we basically said we don't see that there's really a range. Yeah. Now, maybe we were wrong and maybe we should have distinguished the low-volume from the high-volume months. But we seem to say, no, that there really is not a range. Yeah. And I guess then I'm wondering, if the inputs matter, let's assume they do, tell me where in the complaint we know anything about the inputs. Because I get your benchmark point, you know, everybody's relying on it. I don't know how clearly that's established, but let's take that as a given. Yeah. But I don't understand where in the complaint, because I think we're stuck relying on the complaint right now, right? Yes, although... Well, okay. You can get to the although first, but why don't we start by saying, where in the complaint do we learn in any definitive way about what the inputs are? They do not spell out the inputs in the complaint, Your Honor.  So, so if there were no additional facts that we can consider, and maybe you're about to tell me there are some extraneous facts we can, that are integral to the complaint, if we don't have facts about the inputs, how can we rule on 12B6 here? Well, let me take that, a couple of points there, Your Honor. First, there are some facts in documents that are incorporated by reference. So my colleague here spoke about the magazine that's attached. So for instance, at, this is page A186 of the appendix, Mr. Greenberger talked about the guide that precedes the price list, and it talks about Rappaport Diamond Specification A3. The Rappaport price list is based on the following specifications, and it lists shape, cut, polish, symmetry, coulette, depth, table. There's a list of factors here, all factual.  Well, but not the source of pricing based on those factors. That's different, right? Those are the factors that Rappaport considers in determining what it believes the price is. Well, but what's the source? Is, I would assume that your argument would be, well, they're looking at the market of what diamonds are being sold for based on shape, cut, polish, symmetry, et cetera. But if they are, again, in my hypothetical, looking at the pricing in the market of those factors, but other things as well, based on their expertise that's not based on simply looking at data, that gets back to the simpler question of, are they looking at more than just the recent market data? I get that is a list of sort of the market data. Right. But my question is, are they looking, do we know that they're looking only at that market data, or are they looking beyond that market data? We don't know. And they say they're not. They say they're considering, you know, their sort of vague knowledge of the industry. They say they're not. So that would be helpful, but where does it say that? In their complaint, they plead, it's sort of boilerplate, but they say, here's the complaint. Paragraph 14. The information on the Rappaport price list is the unique product of Rappaport USA's analysis and sophisticated expert industry opinion derived from its extensive market research and proprietary knowledge, and from Rappaport USA's decades of knowledge, investment, and industry relationship. Well, presumably their decades of knowledge extends far beyond what the price was yesterday. Correct. It could mean, drawing all inferences in favor of the plaintiff, our knowledge of where the diamond industry is going to be in 20 years, which doesn't sound like the settlement prices are not maximum, how futures trading happened yesterday. As I understand it, Your Honor, the price list is not saying what the prices will be in some distant future. No, no, no. What I'm saying is, you can factor in all sorts of things, you know, what makes something investment worthy or something, you know, where you're going to be able to sell it in 10 years. I don't know. But I guess I keep coming back to, I don't know what that means. Yeah, but I come back to the fact that I don't think it matters ultimately, because these prices, as published by Rappaport, are relied on by the industry. They are the market price, essentially, or at least the starting point for the market price that, by their own pleading, everybody relies on. So the idea that somehow they can say, this is the objective or the proper price for a particular diamond, everybody in the industry trades on it, but you can't say that. What if this were Sotheby's and they had an old master's section, which maybe they do for all I know, and they had experts who would go through and price every painting by every Italian Renaissance master, even though those paintings get sold maybe every 150 years. Basically, none of it premised on the actual sales of particular paintings, but all based on the fact that the people pricing it are art historians, but it's certainly not based on hard data. And everybody agreed that those were the benchmarks that everyone bases their bids on when they go to auction. Would you take the same position? I would, Your Honor. And I think if you think about how that would play out, that argument would mean that Sotheby's says this painting is worth a million dollars. I want to sell it to you for $750,000. I can't say this is a great deal. It's $250,000 less than Sotheby's says it's worth. I wouldn't be allowed to say that without committing copyright infringement. And that just can't be, I don't believe. So can you explain to me why your market reliance or market dominance distinguishes you from CCC then? Like, I mean, the Red Book is what I thought most people would have consulted before by a  Yeah. I'm not sure the market dominance part of it alone distinguishes CCC, but the compilation point distinguishes CCC. CCC was specifically about the taking of the entire compilation and essentially reproducing it, which is not what's alleged and certainly not what's shown. So you're saying it's the presentation of, you're saying it's the presentation of the information? Not so much the presentation, Your Honor, but the fact that what was protected there was the compilation. The compilation is the selection arrangement, how it's laid out, what's in it, as opposed to an individual number. I think CCC would have come out differently if the claim was you said that this particular car was worth X and you took that number from us. That's not what CCC was alleging. They were alleging they took the entire work, the entire compilation. And the compilation prices talk about selection arrangement of what facts go into the  That's different than saying we're considering the following facts to come up with a particular number. Say that again. How is that different? So saying, how is, they would say that their price is the compilation of a bunch of things we don't know. Right. So how is that different? I don't believe an individual price can be a compilation in the same way that a table, you know, you can argue that the table, the actual chart that Rappaport puts out, maybe you could argue that's a compilation. They haven't pled it and they certainly haven't registered it that way, but at least that's an argument. They're not saying that. They're saying each number is a compilation. And that to me is not. That's not what he said. A number would be a de minimis, but you didn't do one number, right? Well, but they're pleading that each, taking each number is an infringement. They're not pleading that the table is being reproduced or that the work as a whole is being reproduced. They're saying you use our numbers. In some undetermined amount. Can I ask you about the calculator? Certainly. I understand that the blue brief is arguing, this is page 11 and 12, that you can just plug data in. I don't know what it is here. The size, the shape, the color, the clarity of various diamonds, and then it'll spit out the calculator what the discount is, right? That's my understanding. Yes, Your Honor. How is that not just a different presentation of the actual chart? I mean, I assume if you were, well, maybe you're saying that you, I thought you were distinguishing that if you guys were to literally photocopy, you know, the diamond report, right? And print the whole chart. Yes. That would maybe be a copyright violation because it's the whole compilation. But what do you do if you just digitize that and say, hey, plug it in and I'll give you any number on the chart? Is that really the same thing? How is that not different? Or how is it not the same? Just in a slightly different format. Yeah. Well, there's nothing in the record about how the calculator works or what goes into it. Well, but a fair inference. It seems that at the 12B6 stage, is if you put that in, they're saying you scrape their data, that you can input all of the variables and that it lists the discount. And I thought you were agreeing that at least on the page that lists a particular diamond, when it says discount, or it has just a negative sign with a percentage, that that is the discount from the wrap-up port price. Yes. So are you suggesting that the discount percentage on the calculator page is not a reference to a percentage discount off the wrap-up port price? No, I believe it is. Oh, so we're talking about the same thing. So how is that not basically saying, well, we're not putting the table in front of you, but you can input all the same data points, the same variables, and we'll give you the discount. How is that not just reprinting the chart, but in a happily searchable form? Isn't that? Well, I think the distinction, again, Your Honor, is that it's for an individual diamond. It's not the table as a whole. You're not seeing the list of, oh, if we increase. So you have to put each variable in to recreate the chart. Individually, yeah. You can, you know, if the argument is you can sort of, you know, reverse engineer the chart, that's not really, it doesn't seem feasible, first of all. The actual graphic representation of the chart is what is arguably copyrighted, not the fact that you can input it and individually pull up every single thing. Correct. If they were arguing that there's a compilation here, which they have not argued, but if they were, then the compilation would be the chart as a whole, this sort of four-page document with columns and tables and rows and notations and everything else. They have not alleged that that's been copied and it's not on the bonus site. So I see my time is up. I'm happy to answer any more questions. Thank you. We'll hear from Al. I agree with Judge Nardini that the meat of the New York mercantile case is that very quote that you made. And in this case, Judge Rakoff stopped after the word number and forgot to consider the part that says the question then becomes the possible range of that number. And that really is where the reliance on the fact that it's a number is the mistake because the court has to consider what the possible range of that number is. To Judge Nardini's point about the calculator, that's exactly my understanding as well, too. You could change any of those variables and get the exact same thing that Rappaport's price sheet says for those same numbers. And to Judge Perez's point about there being other lists in the market, there are. We've asked the court to take judicial notice of that. And what it shows is that Rappaport does not have a monopoly on what is the, on what price opinions should be, right? That's what the merger doctrine is concerned about, is giving people a monopoly over an idea. That's not what copyright law protects. It protects the expression of that idea. And here, Rappaport is not monopolizing the market for opinions, pricing opinions for diamonds. It's just saying this is our protectable opinion and Nevoda is wholesale copying it in violation of our rights. Well, could you just address what your understanding of it means to say the international benchmark used by dealers to establish diamond prices in the market? Right. It's the benchmark in the sense that the trade uses it as a guide, as an estimate. My client is respected in the industry, OK? But we even say in the guide that accompanies the price sheet, it's our estimate. There's different market factors. You be the judge, which is exactly the same thing that this court said in CCC, which is people respect the editors of the Red Book's opinion. But ultimately, it's up to the consumer to decide how much value they put on that opinion and what factors to consider on any specific transaction. So for. Are you trying to have your cake and eat it, too? Because I think your colleague would say you are the market reality, that everyone, like everyone or almost everyone, treats it as the number that a diamond should sell for. And if you could explain to me, where is the line between we're so highly respected that everyone really considers it and you're de facto the market reality? I'll go to New York Mercantile, OK, where by law they were required to publish those closing prices and the market treated it as a fact. Here, there's no evidence that the market treats it as a fact. If anything, the record shows that people use it just as a guideline because they trade at percentage discounts. That's exactly what Novota's website shows on those product listings, is that we're going to sell this diamond for a 67 percent discount or whatever percentage it might be. So Rappaport is not required by law to publish its price list and people respect it. OK, but that doesn't mean it's the fact. That doesn't mean this is what it is. And indeed, they're not even reporting on specific diamonds. These are all hypothetical. My colleague points to the specification in the guide as to this Rappaport A3, right? There's so many assumptions that go into these numbers. Is it perfect polish? Is it perfectly cut? Is it perfectly symmetrical? That's not the real world. Different diamonds have different characteristics to them beyond just the color, shape, weight, clarity. And so to go back to your answer, it's not a fact. It's an opinion. Thankfully, the market appreciates Mr. Rappaport. And this is exactly why copyright law should protect him, to incentivize people to further arts and sciences and debate. And that's it. Any further questions? Thank you, Your Honors. We'll take the matter under advisement. Thank you. Thank you both. Well argued.